UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                   :

LUMINENT MORTGAGE CAPITAL, INC.;     :
MINERVA MORTGAGE FINANCE           :
CORPORATION; and MERCURY MORTGAGE :     07 Civ. 9340 (PKC)
FINANCE STATUTORY TRUST,          :

                  Plaintiffs,   :

                  v.        :     **AMENDED ANSWER AND**
                              :     **COUNTERCLAIMS**
HSBC SECURITIES (USA) INC.,        :

                  Defendant.  :
------------------------------------------------------------------ X

       Defendant HSBC Securities (USA) Inc. ("HSBC") by its attorneys Cleary Gottlieb Steen & Hamilton LLP, as and for its Answer to the Complaint of Plaintiffs Luminent Mortgage Capital, Inc. ("Luminent"), Minerva Mortgage Finance Corporation ("Minerva"), and Mercury Mortgage Finance Statutory Trust ("Mercury") (collectively, "Plaintiffs"), dated October 18, 2007, states as follows:

**PARTIES**

       1.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint.

       2.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint.

       3.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 of the Complaint.

       4.     HSBC admits the allegations in paragraph 4 of the Complaint.

## JURISDICTION AND VENUE

5.      HSBC lacks knowledge or information sufficient to form a believe as to the truth of the allegations in paragraph 5 of the Complaint, except that it admits that the amount in controversy is in excess of $75,000, exclusive of interest and costs.

6.      Paragraph 6 of the Complaint purports to state legal conclusions to which no responsive pleading is required.

## NATURE OF THE ACTION

7.      HSBC denies the allegations in paragraph 7 of the Complaint.

8.      HSBC denies the allegations in paragraph 8 of the Complaint.

## COMMON ALLEGATIONS

9.      HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint, except that it admits that in connection with transactions with HSBC, Luminent irrevocably and unconditionally guaranteed Minerva's and Mercury's obligations.

10.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint, except that it admits that Minerva entered into a "repurchase agreement" with HSBC.

11.     HSBC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint, except that it admits that Mercury entered into a "repurchase agreement" with HSBC.

12.     HSBC denies the allegations in paragraph 12 of the complaint, except that it avers that it is a FINRA regulated broker/dealer engaged in the business of, *inter alia*, buying and selling securities and enters into repurchase agreements as part of its business.

13.     HSBC denies the allegations in paragraph 13 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

14.     HSBC admits the allegations in paragraph 14 of the Complaint, except that it refers to the Agreements for their dates of execution.

15.     HSBC admits the allegations in paragraph 15 of the Complaint.

16.     HSBC denies the allegations in paragraph 16 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

17.     HSBC denies the allegations in paragraph 17 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

18.     HSBC denies the allegations in paragraph 18 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

19.     HSBC denies the allegations in paragraph 19 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

20.     HSBC denies the allegations in paragraph 20 of the Complaint, except that it avers that the NIM Bond was originally purchased on July 23, 2007 and that the repurchase transaction was subsequently extended on July 27, 2007 and refers to the Agreements and the written confirmation of these transactions for their true and correct contents.

21.     HSBC denies the allegations in paragraph 21 of the Complaint, except that it admits that on July 27, 2007, the NIM Bond had a face amount of $14,065,818.87 and was rated "A-" by Standard & Poor's and Fitch Ratings.

22.     HSBC denies the allegations in paragraph 22 of the Complaint, except that it avers that Mercury executed eight repurchase transactions with HSBC between May 7 and May 11, 2007 relating to eight additional bonds, and that Mercury renewed each bond's repurchase agreement between five and seven times through subsequent repurchase transactions (known as "rolling") during May, June, July and August of ~~2007, including renewals~~**2007. HSBC admits that Mercury "rolled over" the repurchase transactions on the eight additional bonds in question** on August 3, 2007.

23.     HSBC denies the allegations in paragraph 23 of the Complaint, except that it admits that the price of many subprime bonds fell in August 2007 as a result of actual and significant adverse developments in the subprime mortgage market.

24.     HSBC denies the allegations in paragraph 24 of the Complaint, except that it admits that on August 3, 2007, HSBC issued margin calls, in accordance with the provisions of the Agreements~~, and Plaintiffs refused to meet HSBC's margin calls~~**.  HSBC further avers that Mercury agreed to pay all of the August 3, 2007 margin calls on the repurchase transactions on Mercury's eight bonds, and HSBC agreed to withdraw the August 3, 2007 margin call on the repurchase transaction on Minerva's NIM Bond**.

25.     HSBC denies the allegations in paragraph 25 of the Complaint, except that it ~~admits that Plaintiffs refused to meet HSBC's margin calls~~**avers that Mercury agreed to pay all of the August 3, 2007 margin calls on the repurchase transactions on Mercury's eight**

**bonds, and HSBC agreed to withdraw the August 3, 2007 margin call on the repurchase transaction on Minerva's NIM Bond**

26.     HSBC denies the allegations in paragraph 26 of the Complaint, except that it admits that prior to August 27, 2007, HSBC held an auction with respect to the nine Bonds regarding which Plaintiffs ~~refused to~~**failed either to repurchase from HSBC or** meet HSBC's margin calls **on August 8, 2007 as required by the Agreements**.

27.     HSBC denies the allegations in paragraph 27 of the Complaint, except that it admits that on August 27, 2007, HSBC emailed Luminent a spreadsheet that showed the results of the auction held with respect to the nine Bonds regarding which Plaintiffs ~~refused to~~**failed either to repurchase from HSBC or** meet HSBC's margin calls **on August 8, 2007 as required by the Agreements**.  HSBC further admits that it submitted the highest bid for each of the Bonds.

28.     HSBC denies the allegations in paragraph 28 of the Complaint, except that it admits that it received one third-party bid for the NIM Bond, two third-party bids for five of the other eight Bonds, and three third-party bids for the remaining three Bonds.

29.     HSBC denies the allegations in paragraph 29 of the Complaint, except that it admits that a third-party bidder for the NIM Bond bid $60.13 per $100 of face value and that HSBC bid $70.

30.     HSBC denies the allegations in paragraph 30 of the Complaint.

31.     HSBC denies the allegations in paragraph 31 of the Complaint, except that it admits that by September 20, 2007, HSBC owned the Bonds.

32.     HSBC denies the allegations in paragraph 32 of the Complaint, except that it admits that Plaintiffs sent HSBC an email at 5:42 PM on October 2, 2007, offering to

repurchase the Bonds on the next day for the ~~principal amount owed plus accrued interest~~**contractual repurchase price** through October 2.  HSBC further avers that it responded in its own email that same day that the Bonds were no longer **held subject to** a repo position, that it had conducted an auction and ~~taken down~~**purchased** the securities **free of the repo**, and that it welcomed a discussion to resolve its claims against Plaintiffs and was prepared to negotiate those claims.  HSBC further avers that Plaintiffs did not respond to this email to engage in such discussion.

33.    HSBC denies the allegations in paragraph 33 of the Complaint.

## FIRST CAUSE OF ACTION

34.    HSBC repeats and realleges each and every response set forth in paragraphs 1 through 33 of this answer as if fully set forth herein.

35.    HSBC denies the allegations in paragraph 35 of the Complaint, except that it admits that each Repurchase Agreement is a valid, binding and enforceable contract, supported by good and valuable consideration, and refers to the Agreements for their true and correct contents.

36.    HSBC denies the allegations in paragraph 36 of the Complaint.

37.    HSBC denies the allegations in paragraph 37 of the Complaint.

## SECOND CAUSE OF ACTION

38.    HSBC repeats and realleges each and every response set forth in paragraphs 1 through 37 of this answer as if fully set forth herein.

39.    HSBC denies the allegations in paragraph 39 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

40.    HSBC denies the allegations in paragraph 40 of the Complaint.

41.     HSBC denies the allegations in paragraph 41 of the Complaint.

## THIRD CAUSE OF ACTION

42.     HSBC repeats and realleges each and every response set forth in paragraphs 1 through 41 of this answer as if fully set forth herein.

43.     HSBC denies the allegations in paragraph 43 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

44.     HSBC denies the allegations in paragraph 44 of the Complaint.

45.     HSBC denies the allegations in paragraph 45 of the Complaint.

46.     HSBC denies the allegations in paragraph 46 of the Complaint.

47.     HSBC denies the allegations in paragraph 47 of the Complaint.

## FOURTH CAUSE OF ACTION

48.     HSBC repeats and realleges each and every response set forth in paragraphs 1 through 47 of this answer as if fully set forth herein.

49.     HSBC denies the allegations in paragraph 49 of the Complaint to the extent they are inconsistent with the Agreements between the parties to this action and refers to such agreements for their true and correct contents.

50.     HSBC denies the allegations in paragraph 50 of the Complaint.

51.     HSBC denies the allegations in paragraph 51 of the Complaint.

52.     HSBC denies the allegations in paragraph 52 of the Complaint.

53.     HSBC denies the allegations in paragraph 53 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

54.     The Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

55.    Plaintiffs lack standing to bring these claims.

## THIRD AFFIRMATIVE DEFENSE

56.    Plaintiffs' claims are barred by the doctrine of unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

57.    Plaintiffs' claims are barred by the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

58.    Plaintiffs' claims are barred by estoppel.

## SIXTH AFFIRMATIVE DEFENSE

59.    Plaintiffs' claims are barred by waiver.

## SEVENTH AFFIRMATIVE DEFENSE

60.    To the extent that Plaintiffs have suffered damages, any such damages were not caused by any conduct of HSBC, but resulted in whole or in part from the conduct of Plaintiffs and/or persons other than HSBC.

## FURTHER AFFIRMATIVE DEFENSES

61.    HSBC hereby gives notice that it intends to rely upon any other defense or defenses that may become available or appear during the pre-trial proceedings in this case and hereby reserves the right to amend its Answer to assert any such defenses.

## AS AND FOR HSBC'S COUNTERCLAIMS AGAINST PLAINTIFFS

62.    Notwithstanding Plaintiffs' commencement of this lawsuit, Plaintiffs are the parties who have breached their Agreements with HSBC, refused to pay amounts plainly owed to HSBC, and wrongfully retained principal and interest payments erroneously paid to them instead of to HSBC.  As such, HSBC brings counterclaims against Plaintiffs for 1) breach of contract, 2) unjust enrichment, and 3) monies had and received to recover the losses HSBC

8

has suffered, as well as a claim for legal fees and expenses (including attorneys' fees) as provided for under the parties' contracts.

## COMMON ALLEGATIONS

**A.    Plaintiffs' Agreements with HSBC**

63.    On or around December 19, 2005, Minerva and Mercury each entered into a "Master Repurchase Agreement" with HSBC, each agreement being supplemented by certain annexes thereto (collectively, the "Agreements").  Luminent simultaneously agreed absolutely and unconditionally to act as guarantor for all of Minerva's and Mercury's respective obligations to HSBC.

64.    Under the Agreements, Plaintiffs could enter into transactions with HSBC from time to time, whereby Plaintiffs would sell securities or other assets to HSBC at a specified "Purchase Price."  HSBC would in turn simultaneously agree to sell the Purchased Securities back to Plaintiffs at a specified ~~later date~~**"Repurchase Date"** or on demand at a specified "Repurchase Price."  <u>See</u> Agreements ~~§ 1.~~**§§ 1, 3.**  The "Repurchase Price" was the price at which the securities were to be transferred from HSBC to Plaintiffs upon termination of the transaction, which price is the sum of the Purchase Price and the "Price Differential," representing the charge for funding the Purchase Price over the term of the repurchase transaction.  <u>See</u> Agreements §§ 2(r); 2(k).

65.    In the Agreements, Plaintiffs agreed that if at any time the aggregate market value of any of the Purchased Securities fell below 100% of the applicable Repurchase Price, HSBC would have the right to issue a margin call, and Plaintiff would be obligated to post cash or additional securities sufficient to cover the shortfall in value.  <u>See</u> Agreements § 4; Agreements Annex I § 3.

66.    Plaintiffs further supported their promise to meet margin calls and satisfy their shortfall in Section 11 of the Agreements, which provided that if Plaintiffs failed to meet a margin call, HSBC could declare an "Event of Default."

67.    Plaintiffs agreed that, following an Event of Default, they would be obligated "to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date [i.e., the date of the default]." Such payment would be "immediately due and payable." See Agreements § 11(b)(i). Furthermore, Plaintiffs acknowledged that all income paid on the Purchased Securities after the Event of Default would be retained by HSBC. See Agreements § 11(b)(ii).

68.    If Plaintiffs failed to comply with their obligations to repurchase all Purchased Securities at the Repurchase Price, HSBC would be entitled to "(A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as [HSBC] may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices or any other amounts owing by [Plaintiffs] hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give [Plaintiffs] credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by [Plaintiffs] hereunder." Agreements § 11(d)(i).

69.    The parties agreed that if Plaintiffs defaulted, Plaintiffs would be liable to HSBC for all damages arising out of the Event of Default and for all expenses, including

reasonable legal expenses, incurred by HSBC in connection with or as a result of the Event of Default.  See Agreements § 11(g).

**B.    The Repurchase Transactions and Plaintiffs' Subsequent Default**

70.    Between May 7 and 11, 2007, pursuant to its Repurchase Agreement, Mercury sold HSBC eight bonds and agreed to repurchase them on dates ranging from May 14 to June 11 for Repurchase Prices representing the Purchase Prices plus the Price Differentials (calculated by reference to funding rates between 5.4%–5.5% per annum).

71.    Mercury subsequently "rolled over" the repurchase transactions for each bond, renewing and/or extending the repurchase agreement of each bond between five and seven times in May, June, July and August 2007.

72.    On July 23, 2007, pursuant to its Repurchase Agreement, Minerva sold HSBC a bond issued by HASCO NIM (CAYMAN) COMPANY 2007-NC1 bearing CUSIP number 418098AA7 (the "NIM Bond" and, together with the eight bonds referenced in the preceding two paragraphs, the "Bonds") for a net price of $62.50 per $100 of face value. Minerva ~~pledged~~**agreed** to repurchase the NIM Bond on August 22, 2007 for a Repurchase Price representing the initial Purchase Price plus the Price Differential (calculated by reference to a funding rate of 5.57% per annum).

73.    On July 27, 2007, Minerva extended the repurchase transaction for the NIM Bond, ~~pledging~~**agreeing** to repurchase the Bond on August 27, 2007 for a Repurchase Price representing the initial Purchase Price plus the Price Differential (calculated by reference to a funding rate of 5.57% per annum).

74.    Payment of the eight Bonds that Mercury sold to HSBC were collateralized by so-called "subprime mortgages."  As a result, the value of the Bonds and the

likelihood of ultimate repayment were dependent on, among other factors, the payment performance of borrowers under such subprime mortgages.

75.     Payment of the NIM Bond that Minerva sold to HSBC was not backed directly by subprime mortgage loans but was backed by so-called "residual interests," the most subordinated securities issued in securitized pools of subprime mortgage loans.  As a result, the NIM Bond was particularly susceptible to the risk of non-payment on the underlying subprime mortgages.

76.     The rate of default in the market for subprime mortgages rose significantly in 2007.  Rising default rates on subprime home loans have led to large declines in the values of securities, such as the Bonds, collateralized by such mortgages.  More than twenty subprime mortgage originators have declared bankruptcy.  Many such securities once rated AAA by credit rating agencies have been significantly downgraded due to the non-payment or predicted non-payment of principal and interest payments.  Large financial institutions have been forced to mark down, and continue to mark down, billions of dollars of subprime-mortgage-backed assets. Not surprisingly, the subprime mortgage crisis also affected the market value of the Bonds.

77.     The subprime mortgage crisis has also affected the payment window of the Bonds.  In particular, because the NIM Bond was highly susceptible to the performance of subprime mortgages, rising default rates and declining rates of subprime mortgage prepayment caused the NIM Bond to fall behind its projected payment plan, thus extending its payment window beyond the projections in its offering plan.

78.     As a result of the Bonds' decline in market value, HSBC issued several margin calls to Mercury prior to August 6, 2007, all of which were met in accordance with Mercury's obligations under the Agreements.

12

79. For example, on July 10, 2007, HSBC issued a margin call to Mercury in the sum of $500,224.42, which was duly satisfied on July 11, ~~and on August 3, 2007, HSBC issued a margin call to Mercury in the sum of $1,612,000, which was duly satisfied that same day.~~ **2007.**

**80. On August 3, 2007, HSBC issued margin calls to Mercury and Minerva. Plaintiffs disputed all of HSBC's margin calls, but eventually agreed to pay all of the Mercury margin calls. HSBC agreed to withdraw the margin call on the repurchase transaction on Minerva's NIM Bond.**

**C. Plaintiffs' Failure to Pay the Repurchase Price and Satisfy Their Obligations**

**81. On August 6, 2007, Luminent issued a press release in which it stated, *inter alia*, that Luminent was suspending dividend payments and that the New York Stock Exchange had halted trading in Luminent's common stock.**

**82. On August 7, 2007, at or around 11:00 a.m., Luminent conducted a conference call with its repurchase agreement counterparties. Luminent CEO Trez Moore stated that Luminent received margin calls from ten repurchase agreement counterparties that day.**

**83. Mr. Moore stated on this call that Luminent had received approximately $60 million in margin calls and admitted that he could not say whether or not Plaintiffs could meet their margin call obligations.**

**84. The Repurchase Date for the repurchase transaction on one of the Bonds (bearing the CUSIP number 40430HCQ9 (the "HCQ9 Bond")) was August 7, 2007. Under the relevant Agreement, Mercury was obligated to repurchase the HCQ9 Bond for the full Repurchase Price on August 7, 2007. Following Mr. Moore's conference call, HSBC agreed to roll over the HCQ9 Bond for one more day, to August 8, 2007.**

13

**85.    The revised Repurchase Date for the repurchase transaction on the HCQ9 Bond, along with the Repurchase Dates for the repurchase transactions of six other bonds — all of the Bonds except the NIM Bond and the bond bearing CUSIP number 32029AAP2 (the "AAP2 Bond") — was August 8, 2007.  Under the relevant Agreement, Mercury was obligated to repurchase these seven bonds for the full Repurchase Prices on August 8, 2007.**

**86.    On August 8, 2007, HSBC told Plaintiffs that it would not further roll over the repurchase transactions on the seven bonds due for repurchase past that date.**

**87.    Plaintiffs failed to repurchase the Bonds as required by the Agreements.**

88.    80. On **Also on** August 3 and August 6,8, 2007, as it had done several times previously, HSBC issued margin calls to Minerva and Mercury, respectively, due to the Bonds' continued decline in market value.  On these dates**this date**, Plaintiffs did not satisfy the margin calls.

89.    81. Consequently, on August 8, 2007, HSBC notified Plaintiffs that they were in default.  As prescribed by the Agreements, HSBC sent to Plaintiffs notices of the termination of their respective repurchase transactions.

C.    Plaintiffs' Failure to Pay the Repurchase Price and Satisfy Their Obligations

90.    82. Under the Agreements, upon the occurrence of an Event of Default, HSBC had the right to sell the Bonds in order to mitigate its losses on its transactions with Plaintiffs.

91.    83. On August 15,9, 2007, as was its right under the Agreements, HSBC conducted an auction for the Bonds.

**92.** 84. HSBC invited the relevant bond trading desks of five major dealers that are active in the market for securities such as the Bonds — the Royal Bank of Scotland**RBS Greenwich Capital**, Barclays, Lehman Brothers, Merrill Lynch and Goldman Sachs — to participate in the auction.  By notifying these five dealers of the auction, HSBC anticipated that their bids would not only reflect their own interest but also that of their customers, such as insurance companies, investment managers, retirement funds, collateralized debt obligation managers, and hedge funds.  In addition to these five dealers, HSBC participated in the auction.

**93.** 85. The auction elicited little buying interest in the Bonds.  Two dealers declined to bid altogether, presumably reflecting their independent commercial analyses that they would be unable to resell the Bonds to customers or to other dealers.

**94.** 86. The other three dealers each bid on between three and all nine of the Bonds.  The bids HSBC received were not surprising, in light of the subprime mortgage crisis, which had caused significant illiquidity in the market for subprime mortgage-backed securities.

**95.** 87. Plaintiffs were aware that the Bonds had lost considerable market value.  Upon information and belief, in the two or three**In the** days preceding HSBC's auction, Plaintiffs had attempted — and failed — to find any third party interested in either buying the Bonds or extending financing to Plaintiffs based on the Bonds at a price level that would enable Plaintiffs to satisfy their obligations to HSBC (i.e., at a price equal to the Repurchase Price).

**96.** 88. In the auction, HSBC submitted the highest bids for each of the Bonds, by a significant percentage in some instances.  While HSBC would have gladly sold the Bonds to a third party willing to meet or exceed its bids, no other bidder was willing to do so.  Had HSBC not participated in the auction, the Bonds would have sold for even less.[1]

---

[1] While they have fluctuated somewhat since the auction, overall the Bonds' value has fallen since they were acquired by HSBC.

**97.    Throughout the day of the auction, HSBC repeatedly contacted Plaintiffs, informed them that it was offering the Bonds for sale, and stated that it would be willing to consider any bids by Plaintiffs on the Bonds.**

**98.    Plaintiffs did not make any bids on any of the Bonds that met or exceeded HSBC's bids.**

**99.**    89. Because the prices for which the Bonds were sold were below the contractually agreed-upon Repurchase Prices, the Agreements require Plaintiffs to make up the shortfall between the Bonds' sale values and the contractual Repurchase Prices.

**100.**    90. Plaintiffs have refused to comply with their contractual obligations to pay HSBC the shortfall.

**D.    Plaintiffs' Wrongful Retention of Unearned Income Profit**

**101.**    91. Section 11(b) of the Agreements provides that, following an Event of Default, all principal and interest payments paid on the Bonds are to be retained by HSBC.

**102.**    92. Furthermore, following the termination of Plaintiffs' repurchase transactions and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and hence was entitled to all principal and interest income paid on the Bonds.

**103.**    93. On **or about** August 25, 2007, even though Events of Default had occurred and HSBC was the rightful owner of the Bonds, $1.64 million of principal and interest income on the Bonds was erroneously paid to Minerva and Mercury.

**104.**    94. On **or about** September 25, 2007, even though Events of Default had occurred and HSBC was the rightful owner of the Bonds, $1.89 million of principal and interest income on the Bonds was erroneously paid to Minerva and Mercury.

16

**105.** ~~95.~~ Despite demands from HSBC to Plaintiffs that they remit the aforementioned payments to HSBC in accordance with the Agreements, Plaintiffs have refused to do so.

## FIRST COUNTERCLAIM

### Breach of Contract (Against Mercury)

**106.** ~~96.~~ HSBC restates and realleges the allegations set forth in Paragraphs ~~61~~**62** through ~~95~~**105** as if set forth fully herein.

**107.** ~~97.~~ The Master Repurchase Agreement between HSBC and Mercury is a valid, binding, and enforceable contract, supported by good and valuable consideration.

**108.** ~~98.~~ The Agreement requires Mercury to meet margin calls by posting cash or additional securities sufficient to cover any shortfall in the market value of the Bonds.

**109.** ~~99.~~ HSBC issued margin calls, which Mercury ~~refused~~**failed** to meet.

**110.** **As a result of Mercury's failure, an Event of Default occurred under the Agreement.**

**111.** ~~100. As a result of Mercury's refusal~~**Further, the Agreement requires Mercury to repurchase bonds on a specific date.  In the case of seven of the eight bonds Mercury was required to repurchase (all except the AAP2 Bond), Mercury failed to do so, and failed timely to pay its obligations to repurchase those Bonds.  As a result of Mercury's failure**, an Event of Default occurred under the Agreement.

**112.** ~~101.~~ The Agreement further provides that if Mercury defaults, Mercury is obligated to immediately repurchase the Bonds at the agreed-upon Repurchase Price.

**113.** ~~102.~~ The Agreement provides that if Mercury fails to so repurchase the Bonds and HSBC exercises its option to sell the Bonds, Mercury is obligated to pay the shortfall to HSBC between the sale price and the Repurchase Price.

17

114. 103. After Mercury failed **either** to meet HSBC's margin calls **or repurchase the bonds that were scheduled to be repurchased,** and the Event of Default occurred, Mercury further breached the Agreement by failing to pay the shortfall between the sale price and the Repurchase Price following the sale of the Bonds. The shortfall was $2,256,891.86.

115. 104. The Agreement also provides that, following an Event of Default, all principal and interest income paid on the Bonds is to be retained by HSBC.

116. 105. After Mercury failed to meet HSBC's margin calls and the Event of Default occurred, $398,034.60 in principal and interest income paid on the Bonds was erroneously transferred to Mercury instead of to HSBC.

117. 106. Notwithstanding HSBC's demand, Mercury has breached the Agreement by refusing to remit to HSBC the principal and interest payments on the Bonds it received following the Event of Default.

118. 107. As a result of the foregoing, HSBC has suffered damages in an amount not less than $2,654,926.46 plus applicable interest.

**SECOND COUNTERCLAIM**

Breach of Contract (Against Minerva)

119. 108. HSBC restates and realleges the allegations set forth in Paragraphs 61**62** through 107**118** as if set forth fully herein.

120. 109. The Master Repurchase Agreement between HSBC and Minerva is a valid, binding, and enforceable contract, supported by good and valuable consideration.

121. 110. The Agreement requires Minerva to meet margin calls by posting cash or additional securities sufficient to cover any shortfall in the market value of the Bonds.

**122.** ~~111.~~ HSBC issued **a** margin ~~calls~~**call**, which Minerva ~~refused~~**failed** to meet.

**123.** ~~112.~~ As a result of Minerva's ~~refusal~~**failure**, an Event of Default occurred under the Agreement.

**124.** ~~113.~~ The Agreement further provides that if Minerva defaults, Minerva is obligated to immediately repurchase the Bonds at the agreed-upon Repurchase Price.

**125.** ~~114.~~ The Agreement provides that if Minerva fails to so repurchase the Bonds and HSBC exercises its option to sell the Bonds, Minerva is obligated to pay to HSBC the shortfall between the sale price and the Repurchase Price.

**126.** ~~115.~~ After Minerva failed to meet HSBC's margin calls and the Event of Default occurred, Minerva further breached the Agreement by failing to pay the shortfall between the sale price and the Repurchase Price following the sale of the Bonds. The shortfall was $737,896.53.

**127.** ~~116.~~ The Agreement also provides that, following an Event of Default, all principal and interest income paid on the Bonds is to be retained by HSBC.

**128.** ~~117.~~ After Minerva failed to meet HSBC's margin calls and the Event of Default occurred, $3,196,241.86 in principal and interest income paid on the Bonds was erroneously transferred to Minerva instead of to HSBC.

**129.** ~~118.~~ Notwithstanding HSBC's demand, Minerva has breached the Agreement by refusing to remit to HSBC the principal and interest payments on the Bonds it received following the Event of Default.

**130.** ~~119.~~ As a result of the foregoing, HSBC has suffered damages in an amount not less than $3,934,138.39 plus applicable interest.

## THIRD COUNTERCLAIM

### Unjust Enrichment (Against Mercury)

**131.** ~~120.~~ HSBC restates and realleges the allegations set forth in Paragraphs ~~61~~**62** through ~~119~~**130** as if set forth fully herein.

**132.** ~~121.~~ Following Mercury's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

**133.** ~~122.~~ Despite HSBC's ownership of the Bonds, Mercury was erroneously paid income from the Bonds in the amount of $398,034.60.

**134.** ~~123.~~ Notwithstanding HSBC's demand, Mercury refuses to remit the income to HSBC and continues to retain such income for itself.

**135.** ~~124.~~ In retaining this income for itself even though HSBC owns the Bonds outright, Mercury has benefited at HSBC's expense in an amount not less than $398,034.60 plus applicable interest.  Equity and good conscience require restitution.

## FOURTH COUNTERCLAIM

### Unjust Enrichment (Against Minerva)

**136.** ~~125.~~ HSBC restates and realleges the allegations set forth in Paragraphs ~~61~~**62** through ~~124~~**135** as if set forth fully herein.

**137.** ~~126.~~ Following Minerva's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

**138.** ~~127.~~ Despite HSBC's ownership of the Bonds, Minerva was erroneously paid income from the Bonds in the amount of $3,196,241.86.

**139.** ~~128.~~Notwithstanding HSBC's demand, Minerva refuses to remit the income to HSBC and continues to retain such income for itself.

**140.** ~~129.~~In retaining this income for itself even though HSBC owns the Bonds outright, Minerva has benefited at HSBC's expense in an amount not less than $3,196,241.86 plus applicable interest.  Equity and good conscience require restitution.

### FIFTH COUNTERCLAIM

#### Monies Had and Received (Against Mercury)

**141.** ~~130.~~HSBC restates and realleges the allegations set forth in Paragraphs ~~61~~**62** through ~~129~~**140** as if set forth fully herein.

**142.** ~~131.~~Following Mercury's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

**143.** ~~132.~~Despite HSBC's ownership of the Bonds, Mercury was erroneously paid income from the Bonds in the amount of $398,034.60.

**144.** ~~133.~~Mercury has received monies that belong to HSBC in an amount not less than $398,034.60 plus applicable interest and has benefited from these monies.  Equity and good conscience require restitution.

### SIXTH COUNTERCLAIM

#### Monies Had and Received (Against Minerva)

**145.** ~~134.~~HSBC restates and realleges the allegations set forth in Paragraphs ~~61~~**62** through ~~133~~**144** as if set forth fully herein.

**146.** ~~135.~~Following Minerva's default and HSBC's purchase of the Bonds, HSBC was the rightful owner of the Bonds and was therefore entitled to the principal and interest income generated from the Bonds.

**147.** ~~136.~~ Despite HSBC's ownership of the Bonds, Minerva was erroneously paid income from the Bonds in the amount of $3,196,241.86.

**148.** ~~137.~~ Minerva has received monies that belong to HSBC in an amount not less than $3,196,241.86 plus applicable interest and has benefited from these monies. Equity and good conscience require restitution.

## SEVENTH COUNTERCLAIM

Legal Fees and Expenses (Against Minerva and Mercury)

**149.** ~~138.~~ HSBC restates and realleges the allegations set forth in Paragraphs ~~61~~**62** through ~~137~~**148** as if set forth fully herein.

**150.** ~~139.~~ Under the Agreements, following Events of Default, the defaulting parties shall be liable to the nondefaulting party for, *inter alia*, "the amount of all reasonable legal fees and expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default." Agreements § 11(g).

**151.** ~~140.~~ Minerva and Mercury have defaulted on their Agreements.

**152.** ~~141.~~ Accordingly, by the terms of the Agreements, Minerva and Mercury are liable to HSBC for its reasonable legal fees and expenses.

## EIGHTH COUNTERCLAIM

Breach of Contract (Against Luminent)

**153.** ~~142.~~ HSBC restates and realleges the allegations set forth in Paragraphs ~~61~~**62** through ~~141~~**152** as if set forth fully herein.

**154.** ~~143.~~ Luminent entered into Guarantee Agreements under which Luminent served as primary obligor and "irrevocably and unconditionally guarantee[d] to [HSBC] ... all of [Minerva's or Mercury's (as applicable)] obligations, liabilities and undertakings to [HSBC] ... as well as all reasonable expenses (including attorney's fees) of collection and enforcement

hereof related to transactions entered into by [Minerva or Mercury (as applicable)] with HSBC."
Guarantee Agreements § 1(a).

**155.** ~~144.~~ HSBC was expressly listed as a counterparty in the Guarantee
Agreements and thus was a third-party beneficiary of the Guarantee Agreements.

**156.** ~~145.~~ HSBC transacted with Mercury and Minerva pursuant to the Master
Repurchase Agreements in reliance upon Luminent's guarantees.

**157.** ~~146.~~ Mercury and Minerva have defaulted on their Agreements and are
liable to HSBC.

**158.** ~~147.~~ Independent of their contractual obligations, Mercury and Minerva
are liable to HSBC for claims of unjust enrichment and monies had and received, each of which
constitutes an "obligation" and/or "liability" to HSBC covered by the Guarantee Agreements.

**159.** ~~148.~~ Notwithstanding HSBC's demand, Luminent has refused to pay any
of the amounts owed to HSBC by either Mercury or Minerva pursuant to the Agreements or
otherwise, or by Luminent pursuant to the Guarantee Agreements, including all amounts owed
by Mercury and Minerva in connection with the First through Seventh Counterclaims herein.

**160.** ~~149.~~ As a result, Luminent has breached the Guarantee Agreements. By
virtue of Luminent's breaches, HSBC has suffered damages in an amount not less than
$6,589,064.85 plus applicable interest.

**161.** ~~150.~~ Under the Guarantee Agreements, Luminent is also liable to HSBC
for "all reasonable expenses (including attorney's fees)." Guarantee Agreements § 1(a).

## RELIEF SOUGHT

WHEREFORE, HSBC requests that this Court:

(i)        dismiss the Complaint in its entirety;

(ii)    award HSBC damages against Mercury in the sum of not less than $2,654,926.46, plus interest;

(iii)    award HSBC damages against Minerva in the sum of not less than $3,934,138.39, plus interest;

(iv)    award HSBC damages against Luminent in the sum of not less than $6,589,064.85, plus interest;

(v)    award HSBC all of its costs and expenses of this action, including reasonable attorneys' fees, as authorized by the parties' contracts and permitted by law; and

(vi)    grant HSBC such other and further relief as this Court may deem just and proper.

Dated: New York, New York
~~November 29, 2007~~**January 30, 2008**

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____
      Jeffrey A. Rosenthal
      A Member of the Firm

One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendant and Counterclaim Plaintiff
HSBC Securities (USA) Inc.

Of Counsel:
Jason P. Gottlieb